In the Matter of the Arbitration between the BOARD OF EDUCATION OF THE CITY OF BUFFALO, Appellant, and BUFFALO COUNCIL OF SUPERVISORS AND ADMINISTRATORS, Respondent.

Fourth Department, May 21, 1976

*Leslie G. Foschio, Corporation Counsel (Anthony Vaccaro* of counsel), for appellant.

*Lipsitz, Green, Fahringer, Roll, Schuller & James (Richard Lipsitz* and *Stuart M. Pohl* of counsel), for respondent.

GOLDMAN, J. Petitioner-appellant, Board of Education of the City of Buffalo (Board), appeals from a denial of its motion to stay arbitration of an employee grievance and from the granting of the cross motion of respondent, the Buffalo Council of Supervisors and Administrators (Council), to compel arbitration.

The respondent Council's demand for arbitration arose out of an incident which occurred at a meeting of the Board on February 26, 1975. According to the fact summary set forth in the demand, school principal Bertram G. Chalmer appeared at the meeting to "read a statement on behalf of a group of principals regarding the need for a plan to integrate the Buffalo Public Schools and to prepare for a prospective federal court decision regarding the same". Before Chalmer had an opportunity to read the statement, Board member Joseph Hillery "threatened, humiliated and berated him" in the presence of Board members and others.[1] In the letter submitted in support of the cross motion to compel arbitration, Chalmer stated that Hillery shook his fists, struck the table, asked him questions but shouted down his attempts to answer, and misread a portion of the statement "to convey a completely false impression by omitting key words". As a result,

---

1. Some of the minutes of the Board meeting were annexed to the petition to stay arbitration. The following excerpts reveal the character of the episode:

"Mr. Hillery: One more point, Mr. Chairman. I thought I saw the Principal of School 31 out here? Is he still here? You're Chalmer, aren't you?

"Mr. Chalmer: Yes.

"Mr. Hillery: You were chairman of a Resolution Committee * * * on this integration workshop, were you not? Have you brought copies of your resolution for the Board to see?

"Mr. Chalmer: I have them.

"Mr. Hillery: Well, I've read it and I want to tell you something, Chalmer. You're not going to force-bus kids out of my district—to number 6 or anywhere else, because we'll get out in the streets and if the bullets fly, I'll still be out there. The h * * * with you and that committee of yours. No, don't pull that stuff on me.

"Mr. Chalmer: Will you listen to me, please?

"Mr. Hillery: No, I won't. I don't have to. When the day comes that you see kids from my district force-bused out there against their parents' wishes, you'll see me dragged out feet first. I'll never * * *".

At that point the meeting went off the record.

Chalmer averred, he "received very embarrassing press coverage and a threatening letter from an anonymous writer".

Some three weeks after the incident the respondent Council's grievance chairman notified the Buffalo Superintendent of Schools by letter that a grievance was being lodged pursuant to the collective bargaining agreement between the Council and the Board, which governs the employment of principals, assistant principals, supervisors and administrators. The grievance letter alleged, as does the demand for arbitration, that Hillery's "public verbal attack" on Chalmer violated provisions of the agreement which read, in pertinent part, as follows: "No Principal or Assistant Principal shall be disciplined, reprimanded, reduced in rank or compensation or deprived of any professional advantage without just cause. Any such action asserted by the Board, or any agent or representative thereof, shall be subject to the grievance procedure herein set forth". By way of relief, both the grievance letter and the demand for arbitration sought a public apology by Hillery to Chalmer.

The collective bargaining agreement provides for a four-step grievance procedure which culminates in binding arbitration at the option of the Council's Grievance Committee. After other steps failed to resolve the grievance, the Council duly demanded arbitration, whereupon the Board commenced the present proceedings to stay arbitration pursuant to CPLR 7503 (subd [b]). The petition acknowledges the existence of the collective bargaining agreement and its grievance procedure, but alleges in essence that the dispute is not arbitrable, for two reasons: (1) the statements of Board member Hillery were made in his individual capacity and not adopted by the Board, so that they do not constitute actions of the Board for which the Board can be held accountable under the collective bargaining agreement; and (2) statements by an elected member of the Board of Education are "protected by law" and cannot be censored or restricted.

The Council responded with a motion to compel arbitration pursuant to CPLR 7503 (subd [a]), alleging that the petition presented only questions for the arbitrator. In denying the motion to stay and granting the cross motion to compel arbitration, Special Term took the view that it was for the arbitrator, not the court, to decide whether there was an arbitrable dispute.

Because public policy favors voluntary settlement and arbi-

trations of labor disputes, both in the public and private sectors, the rule has emerged that where a collective bargaining agreement contains a broad arbitration clause, a dispute asserted under the agreement is presumed to be arbitrable in the absence of "unmistakably clear language" to the contrary. *(Matter of Long Is. Lbr. Co. [Martin]*, 15 NY2d 380, 385. Accord, *Matter of Howard & Co. v Daley*, 27 NY2d 285, 290; *Matter of Fitzgerald [General Elec. Co.]*, 19 NY2d 325; *Belmont Cent. School Dist. v Belmont Teachers Assn.*, 51 AD2d 653; *Matter of Board of Educ. [Auburn Teachers Assn.]*, 49 AD2d 35, 38; *Spencerport Cent. School Dist. v Spencerport Teachers Assn.*, 49 AD2d 1027; *New York Inst. of Technology v Council*, 47 AD2d 659; *Susquehanna Val. Cent. School Dist. v Susquehanna Val. Teachers' Assn.*, 46 AD2d 104, 107-108.) Hence, if the arbitration clause is " 'susceptible of an interpretation that covers the asserted dispute' ", then it is for the arbitrator to decide whether the dispute comes within the scope of the agreement to arbitrate *(Matter of Howard & Co. v Daley,supra*, p 291, quoting *Steelworkers v Warrior & Gulf Co.*, 363 US 574, 582-583; see, also, *Belmont Cent. School Dist. v Belmont Teachers Assn., supra; Matter of Board of Educ. [Auburn Teachers Assn.], supra*, p 38; *Matter of City of Johnstown [Local 779 Johnstown Fire Fighters Assn.]*, 43 AD2d 874, 875; *Board of Educ. v Chautauqua Cent. School Teachers Assn.*, 41 AD2d 47, 50-51).

The present arbitration clause is broad indeed, and we find no clear and express language that would place the asserted grievance beyond its scope. The arbitration clause extends to any "grievance" referred by the Council's Grievance Committee. A "grievance", in turn, is defined as "a complaint of an improper interpretation or application, or a violation of this contract or of Board of Education policy". The only express limitation on the arbitrator's power is that he "shall not add to or amend this agreement".

Moreover, we cannot say that the arbitration clause is not susceptible of an interpretation that would encompass the present grievance, which, in essence, is that Hillery's behavior toward Chalmer constituted discipline, reprimand, or deprivation of "professional advantage" of an administrative employee without just cause. Significantly, the prohibition against unjust reprimand extends to "Any such action asserted by the Board, or any agent or representative thereof". Hillery, a Board member speaking at a Board meeting on a

subject germane to educational policy, was arguably acting as a "representative" of the Board within the contractual language. Similarly, his hostile and abusive statements to Chalmer, a school administrator, arguably amounted to reprimands or deprivation of professional advantage within the language of the contract. Of course it could also be argued that Hillery was acting in his individual capacity rather than as a Board representative, but this is merely a factual issue for the arbitrator's consideration.

If the only issue in this case were whether the parties' agreement to arbitrate was broad enough to encompass the asserted grievance, we would affirm Special Term's order. However, appellant raises a second issue—namely, whether the public policy favoring unfettered discussion by elected representatives in the course of legislative activity precludes arbitration of the present dispute. We conclude that it does.

It is for the courts to decide, as a threshold question, whether the enforcement of an agreement to arbitrate a particular matter would so contravene an important public policy that arbitration should not proceed (see *Matter of National Equip. Rental [American Pecco Corp.]*, 35 AD2d 132, 135, affd 28 NY2d 639; *Durst v Abrash,* 22 AD2d 39, 44, affd 17 NY2d 445). It is recognized, for example, that "matters affecting marriage, child custody, and the like, are not subject to unbridled arbitrability, as might be the case in a private building construction agreement (see, e.g., *Schneider v Schneider,* 17 NY2d 123, 127-128; *Sheets v Sheets,* 22 AD2d 176, 178; *Matter of Fence v Fence,* 64 Misc 2d 480, 483-484 [POLIER, J.]; see, generally, Arbitration—Alimony—Support—Custody, Ann 18 ALR 3d 1264; Domke, Commercial Arbitration, § 13.09, pp 128-129)" *(Matter of Susquehanna Val. Cent. School Dist. [Susquehanna Val. Teachers' Assn.],* 37 NY2d 614, 617; see, also, *Agur v Agur,* 32 AD2d 16, app dsmd as moot 32 NY2d 703, mot to vacate order dsmg app den 33 NY2d 643). Similarly, public policy has been held to prohibit arbitration of matters of will probate and estate distribution *(Matter of Jacobovitz,* 58 Misc 2d 330, 334), as well as alleged violations of New York's antitrust law *(Matter of Aimcee Wholesale Corp. [Tomar Prods.],* 21 NY2d 621, 629-630). Considerations of public policy may also limit the extent to which matters of corporate management can be entrusted to an arbitrator *(Matter of Diamond [Diamond],* 80 NYS2d 465, 467, affd 274 App Div 762; cf. *Matter of Burkin [Katz],* 1 AD2d

655). (See, generally, 8 Weinstein-Korn-Miller, NY Civ Prac, pars 7501.16—7501.20.)

At this time, we are aware of only one case in the area of public sector labor relations which holds that restrictive public policy bars arbitration of an alleged dispute because of its subject matter (*Matter of Board of Educ. of Yonkers City School Dist. v Yonkers Federation of Teachers*, 51 AD2d 568). Although that case is factually different from the instant case, the recent decision in *Matter of Susquehanna Val. Cent. School Dist. (supra)*, clearly invites judicial inquiry when public policy questions are involved. While affirming an order directing arbitration of a dispute over reduction of teaching staff size, the *Susquehanna* court, per Chief Judge BREITEL, stated (pp 616-617):

"Public policy, whether derived from, and whether explicit or implicit in statute or decisional law, or in neither, may also restrict the freedom to arbitrate. * * *

"Key to the analysis is that the freedom to contract in exclusively private enterprises or matters does not blanket public school matters because of the governmental interests and public concerns which may be involved, however rarely that may ever be."

The public policy argument advanced by appellant is that Board member Hillery's statements, made during a public meeting of the Board and pertaining to a matter of educational policy, should be accorded an absolute privilege. The encouragement of free and open discussion by elected representatives in the course of their official duties is a public policy of fundamental importance in our republican form of government. Indeed, for members of the United States Congress and of the New York State Legislature, that policy is constitutionally secured by an absolute "legislative privilege".

Section 11 of article III of the New York State Constitution provides:

"For any speech or debate in either house of the legislature, the members shall not be questioned in any other place."

The United States Constitution contains a virtually identical guarantee (art I, § 6) (see, generally, *Eastland v United States Servicemen's Fund*, 421 US 491; *Doe v McMillan*, 412 US 306, 311-318; *Gravel v United States*, 408 US 606; *People ex rel. Cuvillier v Hagarty*, 209 App Div 832, app dsmd 238 NY 621; *Lincoln Bldg. Assoc. v Barr*, 1 Misc 2d 511, 514-515).

The constitutional "speech and debate" guarantees do not expressly embrace members of local legislative and quasi-legislative bodies. However, some American courts have relied on the public policy which underlies the "speech and debate" clauses in fashioning, within the common law of libel, an absolute privilege for local legislators or executives (see *McNayr v Kelly,* 184 So2d 428, 430-432 [Fla Sup Ct] [county manager]); *Larson v Doner,* 32 Ill App 2d 471 [mayor and city commissioners held absolutely privileged with respect to City Council resolution reciting suspension of city clerk for "malfeasance and negligence"]; *Wachsmuth v Merchants' Nat. Bank,* 96 Mich 426 [alderman held absolutely privileged with respect to contents of resolution he presented at meeting of Common Council]; see, also, *Carter v Jackson,* 10 Utah 2d 284 [by statute, City Council member was immune from slander suit arising out of statement made at City Council meeting and having reasonable relation to subject of meeting]). (See, generally, 35 NY Jur, Libel and Slander, § 104; Libel and Slander, Ann 40 ALR2d 941; Note: 69 Harv L Rev 875, 917-931.) Other jurisdictions have recognized a limited or "qualified" privilege, which extends only to legitimate spoken or written legislative statements uttered in good faith and without malice (see, *Mills v Denny,* 245 Iowa 584; *McClendon v Coverdale,* 57 Del 568.)

We have found no New York decision which considers the applicability of a legislative privilege, either "absolute" or "qualified", to members of local legislative or quasi-legislative bodies. However, New York does recognize a governmental or "executive" privilege for members of Boards of Education, and that privilege, most significantly, is absolute *(Lombardo v Stoke,* 18 NY2d 394; *Smith v Helbraun,* 21 AD2d 830). In *Lombardo (supra),* an allegedly libelous press statement, issued by the Board of Higher Education of the City of New York in response to a charge of religious discrimination, was held to be absolutely privileged. Similarly, in *Smith (supra),* absolute privilege was held to extend to the publication in the minutes of a Board of Education of an allegedly libelous resolution, which embodied the Board's decision to relieve the plaintiff of his duties as Superintendent of Schools and recited the reasons for the action. Judge FULD's incisive reasoning in *Lombardo (supra,* pp 400-401) bears quoting at some length:

"We have previously recognized that making the official statements of some government executives absolutely privi-

leged is ' "essential in the conduct of official business" '. *(Sheridan v. Crisona,* 14 NY2d 108, 112, *supra.)* In our view, the members of the defendant Board of Higher Education are such executives and they should be free to report to the public on appropriate occasions 'without fear of reprisal by civil suit for damages' (14 N Y 2d, at p. 112; see *Smith v. Helbraun,* 21 A D 2d 830, *supra;* contra *Ranous v. Hughes,* 30 Wis. 2d 452). Particularly at the present time, when so much attention has been directed toward eliminating bias and prejudice in the administration of our school systems, it is essential that the public be candidly and promptly informed of the merits underlying such charges. This cannot be done if those who bear the responsibility for operating the public schools—here the Board of Higher Education—have reason to be apprehensive that their motives for speaking out may be misunderstood and give rise to damages in a subsequent suit for defamation. The public's need to know must, therefore, take precedence over the individual's right to defend his reputation in court. Judge LEARNED HAND put it most persuasively in *Gregoire v. Biddle* when he declared (177 F. 2d 579, 581, *supra):*

" '[A]n official, who is in fact guilty of using his powers to vent his spleen upon others * * * should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. * * * [But] it is impossible to know whether the claim is well founded until the case has been tried, and * * * to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible,in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. * * * In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.'

"Absolute privilege does not, of course, mean that a public official can always defame with impunity. He may still be sued if the subject of the communication is unrelated to any matters within his competence (see *James v. Powell,* 14 NY2d 881) or if the form of the communication—e.g., a public

statement—is totally unwarranted. (See *Cheatum v. Wehle,* 5 NY2d 585; *Jacobs v. Herlands,* 51 Misc 2d 907, affd. 259 App. Div. 823.) In such cases, absolute privilege would 'do great harm to individual victims without improving the service of government'. *(Cheatum v. Wehle,* 5 NY2d 585, 593, *supra.)"*

Because of the fundamental importance of free and open legislative debate, this reasoning applies with even greater force to the legislative functions of a Board of Education[2] than to its purely executive acts. Indeed,it would hardly be rational to conclude that the Board's discussions and deliberations enjoy less protection than the very acts and policies engendered thereby.

To permit a Board of Education to be called to account before an arbitral tribunal for a grievance like the present one is to mire it in a collateral controversy that could only detract from its effectiveness in governing the schools. The continual threat that such a proceeding could be invoked, with all its attendant burdens of time, energy, money and perhaps embarrassment to the Board and its individual members, could inhibit free, open and vigorous legislative discussion just as palpably as could the threat of a lawsuit for damages *(Barr v Matteo,* 360 US 564, 571-572). The " 'constant dread of retaliation' " *(Lombardo v Stoke,* p 401, *supra,* quoting *Gregoire v Biddle,* 177 F2d 579, 581) is not a phenomenon peculiar to libel actions.

Accordingly, we conclude that the public policy which bars libel actions against the Board and its members for privileged statements is sufficiently fundamental to New York's system of school governance that arbitration of a contractual grievance based on such a statement must also be barred.

In reaching this conclusion, we in no wise condone the conduct which is the basis of the present grievance. On the

2. It is clear that the Board of Education of the City of Buffalo possesses substantial legislative or quasi-legislative powers. To its elected representatives (Education Law, § 2553, subd 10) are entrusted the "general management and control" of the "educational affairs" of the City (Education Law, §§ 2552, 2554). The Board is authorized to promulgate rules concerning educational policy in the City of Buffalo (Education Law, § 2554, subd 13, par a), and such rules, if not in conflict with legislation, have the force and effect of law *(Matter of Stone v Gross,* 25 AD2d 753, affd 19 NY2d 675). Thus the Board has the power and the duty to discuss and formulate educational policy within the rather broad boundaries set by the Education Law. Boards of Education, no less than the legislative bodies expressly protected by the constitutional "speech and debate" clauses, require free, open and vigorous discussion to illumine the deliberations of their members.

contrary, it is disheartening to see such coarse and intemperate behavior on the part of any elected representative, much less one who is charged with the duty of overseeing the education of children. What is worse, the victim of the diatribe, so far as the record shows, was one who never faltered in the courtesy and civility of his own language and never abandoned that posture of earnest and reasonable discourse which ought to prevail in the precincts of government. Nevertheless, we are constrained to conclude that his right to redress must defer to the need to protect the integrity of legislative discussion. While it is regrettable that elected representatives will sometimes abuse their privileged powers, we must concur with Mr. Justice FRANKFURTER's observation, in a related context, that "[s]elf-discipline and the voters must be the ultimate reliance for discouraging and correcting such abuses" (Tenney v Brandhove, 341 US 367, 378).

The order should be reversed, without costs and petition for stay of arbitration granted.

MARSH, P. J., CARDAMONE, SIMONS and MAHONEY, JJ., concur.

Order unanimously reversed, without costs and petition granted.