OPINION OF THE COURT
Per Curiam.
Order entered October 31, 1986 reversed, without costs, and petitioners’ motion for an order compelling respondents to correct violations at the subject premises is denied, without prejudice to petitioners’ right, if so advised, to maintain a proceeding for such relief as may be appropriate to compensate them for the loss of their tenancies.
The subject of this proceeding is premises 41-43 Avenue B in Manhattan, a lot which consists of two adjacent buildings containing some 20 apartments. The respondents are the owner and managing agent of the property, the former having acquired title in October 1985 at a purchase price of $394,000. It seems clear that the buildings (about 100 years old) were already in an advanced state of distress at the time of purchase. On April 27, 1986, the rear wall collapsed and on May 2, the Department of Buildings issued "repair/vacate” orders for both buildings, directing that all persons in occupancy vacate immediately (there had been a partial vacate order issued on April 22) and that the owner repair certain described conditions deemed dangerous and detrimental to health and safety (see, Administrative Code of City of New York § 27-2125). The order specified such serious conditions as collapsed foundation and rear walls; rotted columns and girders; sagging of the cellar ceiling; and floors out of level. Approximately 16 tenants, protected under either rent control or rent stabilization, had resided in the premises prior to issuance of the vacate orders.
*461 Upon respondents’ failure to make the repairs identified in the "repair/vacate” orders, petitioners (who are nine of the displaced tenants) moved in the Housing Part for an order directing respondents to correct all violations and for an order assessing civil penalties against respondents (Administrative Code § 27-2115 [i]). The Department of Housing Preservation and Development was joined as a party respondent; and the Department has supported the position of the petitioners throughout the proceeding.
The basic defense of the respondents at the hearing below was that the cost of the extensive renovations required to restore the buildings was so prohibitive, given the valuation of the structures, that repair or reconstruction would be economically improvident and confiscatory. To this end, expert testimony was received from both sides as to the nature of the work necessary to restore the premises to habitable condition, and the cost of that work. The hearing court ultimately adopted a total cost figure of $320,000 ($170,000 for structural work and $150,000 for interior improvements) which, it must be presumed, the court did not view as too economically burdensome for respondents to bear. Accordingly, an order was entered directing respondents to, inter alia, replace or repair beams and other structural members as necessary; to rebuild the collapsed rear wall and repair or replace all other exterior walls of the premises; to replace or repair plumbing and electric wiring; and to complete all finishing and cosmetic work so that the premises are in violation-free condition.
There is respectable precedent, in quite analogous cases, that where it is shown to be economically unreasonable to repair uninhabitable premises which have been vacated, an owner will not be compelled "to expend unwisely and wastefully large sums to repair property better demolished” (Harmor Operating Co. v Vent-O-Matic Incinerator Corp., 1 AD2d 551, 554; Matter of Atco-Midwood Assocs. v Benitez, 106 AD2d 501; Rubin v Hevro Realty Corp., 84 Misc 2d 1074). It is apparent from the tenor of the Housing Court’s decision that it did not wish to be seen as condoning a situation where buildings are allowed to deteriorate by their owners to the point where there is no other viable alternative but demolition, resulting in the loss of regulated tenancies and further "gentrification” as former residents are forced out of neighborhoods and replaced by more affluent consumers seeking to occupy upgraded properties. We are not unsympathetic to these general housing concerns, although it remains dubious *462 whether the courts, in the end, are the forum best situated to address the underlying problems of rebuilding the rental housing stock for lower-income and middle-income tenants. But on the particular facts presented in this case, the weight of the evidence persuades us that we are dealing with dwellings which, unfortunately, have deteriorated "to the point where [they] can no longer be reclaimed” (see, Administrative Code § 27-2002 [2], [3]), and where it is no longer economically feasible to salvage them for the benefit of the petitioner tenants.
Estimates testified to by contractors on behalf of the respondents indicated that the cost of the necessary structural repairs would exceed $200,000 (including demolition; rebuilding of rear, front and foundation walls; and replacement of fire escapes, windows and staircases), and that the cost of restoring all apartments would cost $600,000 more. The tenants’ principal witness testified that the basic structural rehabilitation would cost approximately $170,000, and that the cost of the interior renovations would vary depending upon the quality of work done — i.e., a minimal "patch job” to restore the buildings more or less as they were prior to the collapse would cost an additional $150,000 (totaling $320,000); to restore the buildings to "a level of adequate comfort which might be somewhat better condition than they were before the collapse” would cost, in total, $450,000; and to restore to the level of luxury accommodations would amount to about $800,000.
Given the fact that these are buildings which plainly require "radical surgery rather than patchwork” (Harmor Operating Co. v Vent-O-Matic Incinerator Corp., supra, at 554), tenants’ own expert’s alternative estimate of $450,000 (to which must be added perhaps 10% for cost overruns inevitable in projects such as this) is, realistically, the minimum amount which will be required to reconstruct the premises. Not only does that amount greatly exceed the actual assessed valuation of $175,000 (see, New York City Rent and Eviction Regulations [9 NYCRR] § 2204.9 [a] [2]; Rent Stabilization Code [9 NYCRR] § 2524.5 [a] [1] [ii], which permit withdrawal of property from the rental market upon the approval of the Division of Housing and Community Renewal where "substantial violations” have been filed against the property and the cost of removing such violations "would substantially equal or exceed the assessed valuation of the structure”), it exceeds the recent purchase price of $394,000. Moreover, the evidence *463 reveals that even at the time of the buildings’ collapse, the rent roll was not generating sufficient income to carry the property at a profit. Since it is only reasonable to anticipate that the owner’s operating costs will increase considerably on account of the debt that will necessarily be incurred to pay for the "repairs” which petitioners seek, the prospect for continued operating losses well into the future seems unavoidable— even assuming that some upward adjustment in existing rentals is granted by the governing administrative agency. In such circumstances the rent control laws do not require repair rather than demolition (Harmor Operating Co. v Vent-O-Matic Incinerator Corp., supra).
While denying relief to the petitioners in this proceeding, we do not hold that they are without a remedy. By statute, an owner is obligated to keep a multiple dwelling in good repair (Multiple Dwelling Law § 78; Administrative Code § 27-2005). Although there is no proof in this case, or finding below, that the present owner or his predecessors intentionally withheld essential services or engaged in a campaign to drive the tenants out, the collapse of the dwellings in April 1986 must necessarily be viewed as the culmination of a longstanding pattern of neglected maintenance, benign or deliberate, and indifference to legal responsibilities. The respondents are chargeable with knowledge of the physical condition of the premises at the time of their purchase, particularly here where the obvious state of disrepair would have been revealed by even a cursory inspection. In the situation where years of nonfeasance have created conditions which now require that the buildings be vacated and demolished, thereby terminating tenancies protected by law, equitable considerations dictate that relief be fashioned for the tenants affected (see, Matter of Atco-Midwood Assocs. v Benitez, 106 AD2d 501, supra). Our disposition is without prejudice to the maintenance of such a proceeding.