OPINION OF THE COURT
Margaret Taylor, J.
The novel question before the court in this case is whether *957 the owner of a multiple dwelling is required by law to cure code violations found in vacant apartments. For the reasons given below, the court holds that a multiple dwelling owner is obligated by statute to correct all violations in his or her building, whether or not some or all of them are found in vacant apartments.
The 20-unit multiple dwelling at 524 Metropolitan Avenue, Brooklyn, New York has been in effect "owned” by respondent Frank A. Ciolli (owner) for at least 10 years. The premises are managed by respondent Alexander Karas. Mr. Ciolli also owns six other buildings in Brooklyn. There are 170 units in the seven buildings. There have been at least six inspections of the subject premises at 524 Metropolitan Avenue; violations at the premises were reported and issued as far back as February 26, 1975 and as recently as July 10, 1990. Respondents have been in Civil Court on this matter since July 7, 1988 when this proceeding was commenced by the Department of Housing Preservation and Development (HPD) seeking correction of all the reported violations. On May 12, 1989 an order and judgment after inquest was signed by Judge Gerald Bank ordering respondents to correct all the violations in the building (Order). In February 1990 this matter was referred to this court for, inter alia, a hearing on whether to hold respondents in contempt for failure to cure the violations as ordered by Judge Bank.
There is clear and convincing evidence that over a period of years respondents have consistently failed to timely correct several hundred violations in the subject building and have only reluctantly corrected them when faced with large penalties and/or the threat of imprisonment. Nevertheless, respondents have repeatedly claimed that all conditions were repaired and that there was no need to do further work on any of these violations. Such assertions are contradicted by the series of inspectors’ reports that find the same violations over and over again, as well as new ones.
In February 1990, for the first time, respondents denied responsibility for any violations existing in vacant apartments. This assertion was then repeated in an order to show cause (plus affidavit and affirmation) dated August 1, 1990. In these papers, respondents sought an order modifying the 1989 Order mandating that respondents correct all the violations in the subject premises. The modification requested would exempt respondents from the obligation to correct "violations in vacant apartments not on the rental market”.
*958 Both the Multiple Dwelling Law and the Housing Maintenance Code (Administrative Code of City of New York § 27-2001 et seq.) contain preliminary sections that reveal the intent of the legislators: that the housing stock of the State’s cities be preserved and that all occupants of multiple dwellings be afforded safe and healthy housing.
The Multiple Dwelling Law states that multiple dwellings with serious violations "are a menace to the health, safety, morals, welfare, and reasonable comfort of the citizens of the state” (Multiple Dwelling Law §2). For that reason, "the establishment and maintenance of proper housing standards * * * are essential to the public welfare.” (Multiple Dwelling Law § 2.)
The Housing Maintenance Code regulates housing standards in the context of a legislative declaration that "the enforcement of minimum standards of health and safety, fire protection, light and ventilation, cleanliness, repair and maintenance, and occupancy in dwellings is necessary to protect the people of the city against the consequences of urban blight.” (Administrative Code § 27-2002.)
The Housing Maintenance Code "[l]egislative declaration” goes on to define the three bases for enforcing minimum housing standards:
"1. to preserve decent housing;
"2. to prevent adequate or salvageable housing from deteriorating to the point where it can no longer be reclaimed; and
"3. to bring about the basic decencies and minimal standards of healthful living in already deteriorated dwellings, which, although no longer salvageable, must serve as habitations until they can be replaced.” (Administrative Code § 27-2002.)
Case law reflects this position: "[T]he court must consider the condition of the entire building * * * and the condition^] of the various apartments and public areas.” (Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430, 432-433 [Civ Ct, NY County 1984]; emphasis added.) "The intent of the legislative bodies is to protect and preserve existing housing” (supra, at 433).
The logic underlying this construction and application of the Multiple Dwelling Law and the Housing Maintenance Code is clear: a multiple dwelling by its very nature is one in which the independent apartments or units are contiguous in several directions, share services and public areas and are, in *959 essence, interdependent. Most often, a condition existing in one apartment will affect conditions in other apartments. And, obviously, conditions in the public areas affect all tenants and all apartments. Almost 70 years ago, Justice Cardozo eloquently held that: “The legislature has said that the duty [to repair] shall extend, not only to some parts [of a multiple dwelling], but to all.” “We are not at liberty to confine it to those parts of the building not included within the premises demised.” (Altz v Leiberson, 233 NY 16, 18 [1922].)
In the context of such legislative concern, the Multiple Dwelling Law clearly lays out that the "word or words 'occupied,’ 'is occupied,’ 'used’ or 'is used’ * * * be construed as if followed by the words 'or is intended, arranged or designed to be used or occupied.’ ” (Multiple Dwelling Law §4 [1].) The Housing Maintenance Code gives the same construction to the terms “occupied” or "used”. (Administrative Code § 27-2004 [a] [2].) In both statutes, the term “occupied” is not defined in the context of whether a tenant is living in an apartment or whether an apartment is on the rental market, but in the context of the purpose of the multidwelling structure.
Case law supports this construction of the concept of "occupied”: "The statutory definition of multiple dwelling includes * * * existing use of a dwelling occupied by 'three or more families living independently of [one another]’ * * * but also the intended use or design”. (Chan v Kormendi, 118 Misc 2d 1026, 1027 [Civ Ct, Queens County 1983].)
Even where an apartment building is “virtually empty of tenants . . . [t]he clear language of subdivisions 1, 7 and 8 of section 4 of the Multiple Dwelling Law” renders the landlord responsible for not permitting the building in its entirety to fall into disrepair. (Pantekas v Westyard Corp., 44 AD2d 789 [1st Dept 1974].) Indeed, “[a] landlord is under a duty to keep in repair all parts of the building, whether or not demised, and whether or not used in common by all tenants thereof.” (Susskind v 1136 Tenants Corp., 43 Misc 2d 588, 594 [Civ Ct, NY County 1964]; emphasis added.)
The landlord’s specific duty to repair all parts of the building is mandated by subdivision (1) of section 78 of the Multiple Dwelling Law, which provides in pertinent part: "Every multiple dwelling, including its roof or roofs, and every part thereof and the lot upon which it is situated, shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section”.
*960 Likewise, the Housing Maintenance Code mandates:
"a. The owner of a multiple dwelling shall keep the premises in good repair.
"b. The owner of a multiple dwelling, in addition to the duty imposed upon such owner by subdivision a of this section, shall be responsible for compliance with the requirements of this code.” (Administrative Code § 27-2005.) (See also, Eyedent v Vickers Mgt., 138 Misc 2d 459 [App Term, 1st Dept 1988].)
Specifically under both the Multiple Dwelling Law and the Housing Maintenance Code, the owner of a multiple dwelling bears the responsibility for maintaining virtually all exterior and interior parts of her or his building in good repair. Such an owner must be concerned with bulkhead doors, entrance doors, and apartment doors; with walls, ceilings, and floors of all materials; with lights, wiring, outlets, and switches; with locks, keys, and peepholes; with fire escapes, window gates, and smoke detectors; with balustrades, railings, treads, and risers; with boiler rooms and roofs; with toilets, sinks, tubs, shower heads, faucets, and pipes; with hot and cold water, and central heating; with staircases, hallways, yards, courts, areas, and basements; with rats, mice, roaches, water bugs, silverfish, and other vermin; with garbage, trash, and dirt; with mailboxes and fuse boxes; and with much, much more.
In no section of either the Multiple Dwelling Law or the Housing Maintenance Code have the legislators distinguished between occupied and vacant apartments. On the contrary, the two statutes explicitly subsume both conditions under the term "occupied”, which must be read as if followed by " 'or * * * intended, arranged or designed to be * * * occupied.’ ” (Multiple Dwelling Law § 4 [1]; Administrative Code § 27-2004 [a] [2].) Furthermore, the only sections of the statutes that do make the distinction refer explicitly and exclusively to dwellings other than multiple dwellings, using the terms "tenant-occupied dwelling unit in a one- or two-family dwelling” (Administrative Code § 27-2013 [a]; emphasis added).
Since the legislators clearly understood the literal distinction between an occupied and a vacant apartment, and since they specifically included a provision where that distinction is made — in a one- or two-family dwelling only — it is evident that the legislative intent was precisely to include both occupied and vacant apartments within the reach of the statutes’ mandate with reference to landlords’ obligations. If the legislators had wanted to distinguish between vacant and occupied *961 units in multiple dwellings, they would have provided clear language to that effect.
In the instant case, Judge Bank in his 1989 Order decreed that respondents correct all the violations included in the annexed inspection reports.
The Order concluded that "[ejach violation hereinbefore ordered to be corrected by respondents and each and every act hereinbefore ordered to be done by respondents constitutes and is deemed to be an Order of this Court, and any failures by respondents to comply with * * * distinct orders will be deemed to be a contempt of this Court” (emphasis added).
The 1989 Order makes no distinction between vacant and occupied apartments containing violations, despite the fact that apparently some of the apartments involved were vacant at the time the Order was signed. The Order clearly decrees the correction of all violations, wherever they might occur.
Therefore, the Order falls squarely within statutory and case law mandates when it fails to distinguish between violations in occupied apartments and violations in vacant apartments. The Order to correct all violations, furthermore, recognizes that virtually all the violations, wherever they might occur, affect the conditions in all the apartments and in the public areas.
In fact, the Order recognizes what the statutes establish, namely, that there are no exceptions to the maintain-and-repair requirements of the Multiple Dwelling Law and the Housing Maintenance Code. In spite of the clear language of the statutes, however, respondent owner claims exemption from the requirements of the law which obligates him to correct the multiple violations found at 524 Metropolitan Avenue, Brooklyn, New York. He bases this exclusion from the mandates of the Multiple Dwelling Law and the Housing Maintenance Code on the assertion that he has withdrawn from the rental market apartments 1, 6, 7, 9, 10, 11, 12, 13, 15, 17 and 20, in order to ”restor[e] these apartments to the rental market at a future date when respondent is in a financial position to so cope with the problems.”[1]
*962 But the statutes do not recognize any exception to the requirements that multiple dwelling owners abide by the laws, in the first place, and comply with orders to repair, in the second place, where the conditions in the entire building and all its dwelling units are concerned.
Rehabilitating a multiple dwelling does not, per se, waive a building owner’s obligation to abide by the requirements of the relevant statutes, especially where, as here, the proposed rehabilitation may have been rendered necessary by the building owner’s neglect of his building. (See, Commissioner of Hous., Preservation & Dev. v 69 W. 38th St., NYLJ, Aug. 5, 1987, at 11, cols 1, 2 [App Term, 1st Dept] “That landlord has through neglect of the premises * * * necessitated substantial expenditures for repair of the property should not * * * inure the landlord’s benefit.”)
The evidence and testimony are confusing at best regarding the actual moment of the owner’s decision to renovate the vacant apartments. It is only in the last two inspectors’ reports dated July 5, 1990 and July 10, 1990 that a notation is found that "major renovation” is “in process” throughout the building. Since there is no evidence to the contrary, the court can only determine that the owner’s "decision” to renovate the vacant apartments came about sometime in February 1990, and that such an explanation for certain conditions in the building was given to the inspector for the first time on July 5, 1990.
Finally, the owner claims that he is presently not in a financial position to undertake or complete either the renovation or the repair of the presently unoccupied apartments. This is not an acceptable basis for expecting a waiver from compliance with the law and the court’s Order. The owner has shown no evidence that he has attempted to place himself in a better financial situation in order to correct the violations in his building (and, if he desires, also rehabilitate the vacant apartments). He could, for example, apply for bank loans in order to bring the building back to acceptable conditions.
In addition, the appointment of an RPAPL article “7-A Administrator” might be considered where the owner cannot *963 afford to cure the violations in the building and needs financial assistance. If the violations have created a condition "dangerous to life, health or safety, which has existed for five days”, a special proceeding can be initiated to appoint an administrator for the building. (RPAPL 770.) Under the Administrator’s direction, the violations can then be cured. The necessary repairs are paid for by public moneys, although this creates in part a subsequent lien on the building. Needless to say, the appointment of 7-A Administrator should be viewed by all parties concerned and by the courts as a last resort.
The fact is, where a landlord is claiming the right to withdraw units from the rental market in order to rehabilitate them and thereby side-step certain statutory requirements (such as noneviction of tenants or repair and maintenance of buildings), the owner must "establish * * * its good faith in proposing permanently to withdraw * * * housing accommodations from the rental market [by] * * * committing] itself to a definite plan, demonstrating] that the intended alterations would comply with municipal requirements [and] that it possesses] adequate financial capacity to undertake such renovations.” (Matter of L’Antiquaire & The Connoisseur v State Div. of Hous. & Community Renewal, 156 AD2d 319, 320.)
Otherwise, every owner could easily avoid compliance with the statutes and court orders requiring the repair of hazardous conditions by the simple expedient of claiming that at some unspecified date in the future an amorphous rehabilitation will take place.
The owner, here, has not generally convinced the court of his good faith where the conditions in his building are concerned. He certainly has not shown the court a rehabilitation plan, including permit applications, that show how projected alterations will comply with municipal regulations. Finally, the owner has also not shown that he will be able financially to undertake this rehabilitation and restore the presently vacant units to the market within a reasonable time. There is a strong implication that the full renovation of presently vacant apartments would' be financially beneficial to the owner (for example, gentrification or higher rent-stabilization rentals as a result of alleged capital improvements). This, however, is an insufficient reason for the court to allow the owner to ignore the statutes or the court’s Order. (See, Commissioner of Hous., Preservation & Dev. v 69 W. 38th St., NYLJ, Aug. 5, 1987, at 11, cols 1, 2 [App Term, 1st Dept], *964 supra, "That the property may have development potential as a near vacant, dilapidated structure, that it does not have as a well maintained, tenanted [building] is manifestly not determinative of this matter.”)
The fact is that, as a matter of law, no real or speculative plan for the future of the building put forth by the owner would relieve him of his obligation to correct all the violations existing at 524 Metropolitan Avenue by either correcting the violations in the vacant apartments or by rehabilitating them. All violations (with minor exceptions) presumptively affect all apartments in the building and all occupants. The statutes sustain and confirm the Order of the court in this presumption.[2]
*965 All the violations listed in the 1989 Order were to be corrected by respondents. By September 27, 1990 this court determined that all the violations in the public areas and the occupied apartments had finally been corrected. Remaining for correction are all the violations in the vacant apartments.
Respondents’ motion to modify the Order of Judge Bank of May 12, 1989, to eliminate the requirement that violations in vacant apartments be cured, is, therefore, denied and respondents must comply with that Order by correcting all violations in the vacant apartments.

. The question of how many vacant apartments actually exist is somewhat troublesome, given the contradictory nature of the evidence and testimony presented. While respondent’s motion lists 11 apartments as vacant, by his own testimony on July 9, 1990 he is currently planning to renovate 13 "vacant” apartments. Furthermore, only 9 apartments have ever been listed as vacant in any of the 6 inspectors’ reports in the file; only *962 8 of these appear on respondent’s list of 11. The most recent inspection report of July 10, 1990 indicates only apartment No. 20 as unoccupied. Furthermore, there is little or no testimony as to when and why any of the unoccupied apartments became vacant, nor as to the general pattern of vacancy and reoccupancy in the building.

. Specifically, violations involving damaged light fixtures and/or exposed wiring, whether in vacant or unoccupied apartments or in public areas, threaten the security and well-being of all occupants and users of the building and the existence of the building itself, because they present a grave risk of electrical failure and even electrical fire, conditions that would clearly impact on the entire building.
Violations involving the absence of smoke detectors whether in vacant or occupied apartments, affect the safety of the entire building and all its occupants and users. Should a fire occur in a vacant apartment, only the presence there of a smoke detector would serve to alert the building’s occupants to the danger. The absence of smoke detectors in any single apartment, vacant or occupied gravely endangers life and property.
Violations involving leaking water pose a risk to all apartments and the entire building if uncorrected. A leak in a vacant apartment can damage the walls and/or the floors and affect contiguous apartments, as well as public areas.
Violations involving vermin of all kinds, animal or insect, clearly affect the entire building. Mice, rats, roaches, water bugs, silverfish and the like do not respect human-made barriers such as walls or doors; they roam through entire buildings, reproduce, migrate and infest when they are allowed to flourish even in one apartment.
Violations involving damaged or nonfunctional windows wherever they occur affect the entire building. Unless all the building’s windows operate smoothly, close tightly, and have all their panes intact, the entire building suffers heat loss as well as problems of security from break-ins and possible water damage from rain.
Violations involving damaged or nonfunctional doors, wherever they occur, affect the whole building. Doors with damaged frames or saddles, missing locks or knobs, or areas missing entire doors pose fire hazards to the entire building, as well as security problems. A door without a knob cannot be opened or closed, in the event of a fire. A door which does not close properly, or which does not lock properly, is an invitation to housebreakers, drug dealers and squatters.
Violations involving damaged floors, of any material, in vacant or occupied apartments, affect contiguous apartments to the extent the damage exposes enough of the surface underneath the flooring to risk flooding to *965 apartments or areas below, or to invite vermin and rodents to use it as an entrance or exit to or from other apartments.
Violations involving either exterior or interior walls that are damaged or otherwise unacceptable by code standards affect the entire building and all contiguous apartments, whether vacant or occupied. Walls that are weakened by water damage, that show holes in the plaster, that are missing bricks, all pose dangers of flooding, collapse or vermin accessibility to the entire building.
Violations involving illegal fire gates on apartment windows pose a danger to all occupants and users of the building, whether they are found in vacant or occupied apartments. In the event of fire, all avenues of escape must be available to those caught inside the building.