OPINION OF THE COURT
George M. Heymann, J.
Petitioner “Alliance”, comprised of approximately 30 tenants residing in the respondent’s apartment complex, commenced this Housing Part (HP) proceeding seeking various forms of affirmative relief and damages, resulting from alleged hazardous conditions in their apartments including water leaks, deterioration of walls and ceilings, interruption of water service and defective electrical services related to the wet walls. Shortly thereafter, respondent commenced 27 nonpayment proceedings against the various tenants involved in the HP action alleging rent arrears for the period commencing January 1, 1998. All the proceedings were then consolidated and assigned to the Honorable Jean Schneider for resolution. After several motions, including a motion by the respondent, herein, to dismiss the HP proceeding, Judge Schneider issued a decision/order, dated August 18, 1998, which, inter alia, denied the motion to dismiss the HP proceeding as against the respondent Parkchester Apartments Co.[1]
Thereafter, both the HP proceeding and the nonpayment proceedings were referred to this Part for trial. This court conducted 10 trials which included the testimony of an expert witness and the submission of various reports regarding the alleged conditions. The testimony of the tenant witnesses was for the dual purpose of establishing their proof in the HP proceeding as well as for seeking abatements in the nonpayment *550 proceedings. As stated by Judge Schneider: “[i]t appears that the present litigation is just one chapter in a long-running saga involving Parkchester Apartments Co. and the Parkchester Alliance, the tenant’s association. These parties have litigated claims under the Federal RICO statute at every level of the Federal court system, an action in Supreme Court in the Bronx, and several groups of nonpayment proceedings dating back at least as far as 1995.”
As a result of the respondents’ efforts to introduce the testimony of an expert witness, respondent made a motion in limine that such testimony should not be permitted as “redundant and irrelevant” and that the documents subpoenaed by the tenants in the nonpayment proceedings should not be admitted into evidence, as well as a motion for a directed verdict on the HP proceeding, finding as a matter of law that the relief sought (i.e., ordering the replumbing of all lines in the subject buildings of the 27 tenants participating in the trials) is not available to the petitioner.[2]
At issue is whether this court has the statutory authority to order the respondent to replace the entire plumbing system in each of the buildings in which the respective tenants that make up the petitioner “Alliance” reside.
According to the respondent, there are 171 separate apartment buildings in the entire complex of which this group of tenants is but a small fraction. While the respondent acknowledges that there are problems with the plumbing systems and sent leaflets to all the tenants in the complex advising them of its long-term goals of resolving those problems, it takes the position that unless there are current violations of record with the appropriate agency, the Department of Housing Preservation and Development (HPD), it is beyond the authority of this court to not only order the owners to replumb all the buildings but to dictate which specific buildings the repairs have to be commenced in.
The statutory scheme for HP proceedings is found in the Housing Maintenance Code (HMC) (Administrative Code of *551 City of NY § 27-2001 et seq.) which was created for the “sound enforcement of minimum housing standards” establishing “a comprehensive code of standards for decent housing maintenance”. (Administrative Code § 27-2002.) Administrative Code, article 2, § 27-2115, Civil Penalty, sets forth the classifications of violations as nonhazardous, hazardous and immediately hazardous, the manner in which an owner or person in charge of a premises is to be notified of violations, the time within which they must be corrected and the penalties for failure to correct. Administrative Code, article 4, § 27-2121, Injunctive Relief, defines the power of the court and provides in relevant part that “[i]n any action or proceeding brought in the housing part of the New York city civil court, the court, on motion of any party or on its own motion, may issue such preliminary, temporary or final orders requiring the owner of property or other responsible person to abate or correct violations of this code, or to comply with an order or notice of the department, or to take such other steps as the court may deem necessary to assure continuing compliance with the requirements of this code, including direction of correction of violations of this code” (emphasis added).
Based on the testimony elicited during the trials there is no dispute that there have been constant leaks, flooding, interruption of water service, damp walls, disruption of electrical service, etc., as a result of the deterioration of the plumbing system. It should also be noted that in each instance where incidents of breakage of pipes, leaks, etc., occurred, the respondent made diligent efforts to repair the conditions within a 24-to 48-hour period and that any violations that were cited were corrected within the statutory time frame after notification. In fact, as noted in Judge Schneider’s decision, the Department of Buildings, after voluntarily inspecting five of the subject buildings for violations of the building codes, reported no violations. Although the testimony of petitioner’s expert witness, Richard Balsey, a licensed engineer, indicates that the “yellow brass” plumbing used when the complex was built has now reached or exceeded its useful life expectancy and should be replaced, it met all the appropriate building codes and standards at the time it was installed. While newer types of plumbing material have replaced the “yellow brass” over the years, and the building codes have been upgraded since Parkchester was under construction, this does not render the remaining plumbing in violation of current building or maintenance codes. Nevertheless, as portions of the existing pipes are replaced, section by *552 section, as necessary, the respondent is obligated to use only the properly approved material in accordance with current building codes and standards. Ideally, replacement of the entire plumbing system would resolve the conditions that initiated this proceeding. While it is true that replacement of the plumbing has been piecemeal, as a stopgap measure, when pipes burst at different times, in different locations, and no doubt will continue to do so, the court believes that it is constrained by statute to limit its relief to the correction of violations as they arise, as opposed to ordering the wholesale replacement of the entire plumbing system for each of the respective buildings where the petitioner tenants reside.
The extensive remedy sought by petitioners caused Judge Schneider to opine “that the petition seeks relief that may be beyond the power of the court to grant in this kind of proceeding.” (See, Various Tenants of 515 E. 12th St. v 515 E. 12th St., 128 Misc 2d 235, 237 [“The court * * * has jurisdiction to order violations corrected”] [emphasis added]; see also, Fernandez v Tsoumpas Bros. Co., 126 Misc 2d 430, 432-433 [the provisions of the Administrative Code specifically empower the court to order the correction of violations upon a determination that same exist and require to be corrected].) As held in Department of Hous., Preservation & Dev. v 999 Realty Mgt. (NYLJ, Sept. 9, 1992, at 24, cols 3, 4; 20 HCR 536 A):
“it is not a provident exercise of this Court’s broad remedial powers under Sec. 110 of the Civil Court Act to compel Respondents to upgrade and replace the electrical and plumbing systems in the buildings. While unquestionably old, there are no current violations against these systems * * *
“[T]he Court is not going to order the upgrade of the still functioning existing system and require the enormous expenditures that such work would entail under penalty of future contempt” (emphasis added).[3]
Therefore, it is the opinion of the court that, despite the consensus of all parties that there is a need to rectify the reoc *553 curring plumbing problems, this HP proceeding must be dismissed as there are no outstanding violations regarding this issue.
Respondent’s motion not to permit the admission into evidence of the testimony or reports of expert witnesses is denied. Notwithstanding this court’s determination that it cannot award the relief sought by petitioners, there is no basis why the testimony of the expert witness or the reports that have been subpoenaed and/or supplied to petitioner as part of the notice to admit should not be made part of the record in this proceeding.
Accordingly, the first branch of respondent’s motion not to permit expert testimony into the record is denied; and the second branch of the motion to dismiss the HP proceeding is granted.

. The court dismissed the proceeding as against the Department of Buildings. Respondent, Parkchester Apartments Co., is presently appealing this decision.

. On January 12, 1999, the court met with counsel for both parties immediately prior to the commencement of taking further testimony in these joint proceedings and advised them that the court was not prepared to grant the relief sought by the tenants in the HP proceeding and was prepared to issue decisions on the tenants’ abatement claims or to assist counsel in reaching an amicable settlement thereof. At the conclusion of the conference, counsel met with their respective clients and agreed to a 33% abatement in each of the nonpayment cases for breach of the warranty of habitability from January 1, 1998 to date.

. Although the court did not hear formal testimony regarding the cost of replacement of the plumbing system or whether it would be an unjust taking in violation of respondent’s rights under the Takings Clause of the Fifth Amendment of the United States Constitution as raised in respondent’s memorandum of law, counsel for both parties concurred during the off-the-record settlement conference (see, n 2, supra) that the dollar value for replacement could reach $200 million. (See, e.g., Bernard v Scharf, 246 AD2d 171, 172 [App Div, 1st Dept] [“given the extreme disparity between the cost of restoration and the building’s apparent value (we find) the option to restore this building should be left to the affected property owner, not commanded by the court”].)