OPINION OF THE COURT
Joseph E. Capella, J.
It is undisputed that on November 14, 2005, the petitioner tenant commenced the instant Housing Part (HP) proceeding to compel the respondent owner to repair both the roof to the subject building and the water damage caused by same within his apartment. It is also undisputed that in 1997, the owner and the tenant entered into a life estate lease, which incorporated a settlement agreement, for the subject premises. Nor is it disputed that under the lease and agreement, the owner is responsible for maintaining the roof. According to paragraph six of the agreement, however, “any controversy or claim arising out of or relating to the agreement or lease or the breach thereof, except those issues which could [directly or indirectly result in eviction], shall be settled by arbitration.” In an attempt to compel arbitration, the owner, by notice of motion dated December 23, 2005, seeks a stay or dismissal of the instant HP proceeding based upon the aforementioned agreement. (CPLR 7503 [a].) It should be noted that, on December 17, 2005, six days prior to the motion, and pursuant to a “Judicial Request/Order for Housing Inspection” dated December 9, 2005, a New York City Department of Housing Preservation and Development (HPD) inspector issued violation number 5901251 for “broken or defective plastered surfaces and paint . . . ceilings and walls in the entire [subject] apartment.” In opposition to the motion, HPD and the tenant argue, inter alia, that public policy precludes arbitration of housing conditions raised in HP proceedings.[1]
It is well settled that arbitration is both favored and encouraged as a means of conserving the time and resources of the *488 courts and the contracting parties (Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am., 37 NY2d 91 [1975]), and the courts have generally not interfered, with few exceptions, in this mode of dispute resolution. (Matter of Sprinzen [Nomberg], 46 NY2d 623 [1979].) The exceptions, which have been narrowly construed, include agreements to arbitrate matters that contravene an important public policy. (Matter of Board of Educ. of City of Buffalo [Buffalo Council of Supervisors & Adm’rs], 52 AD2d 220 [1976]; Durst v Abrash, 22 AD2d 39 [1964], affd 17 NY2d 445 [1965].) However, because an arbitration agreement will not be deemed void as against public policy if it is capable of a construction which would make it consistent with the law and thereby valid (Curtis v Gokey, 68 NY 300 [1877]), defining those areas of public policy that preclude arbitration is not a simple endeavor.
In those cases where the public policy pendulum has swung away from arbitration, guiding criteria have included the pervasiveness of a regulatory scheme and a recognition that arbitrators are not bound by principles of substantive law or rules of evidence that govern the traditional litigation process— their duty is to reach a just result regardless of the technicalities. (Matter of Raisler Corp. [New York City Hous. Auth.], 32 NY2d 274 [1973].) For example, public policy exceptions to arbitration have been found in controversies involving the enforcement of antitrust laws (Matter of Aimcee Wholesale Corp. [Tomar Prods.], 21 NY2d 621 [1968]), and claims concerning the liquidation of insolvent insurance companies. (Matter of Knickerbocker Agency [Holz], 4 NY2d 245 [1958].) In an action similar to the instant proceeding, the Appellate Division in Matter of Goldmar Hotel Corp. (Morningside Studios) (283 App Div 935 [1st Dept 1954]), concerned with the health, safety and welfare of the citizenry, prevented a tenant from arbitrating an obligation to make repairs that violated the Multiple Dwelling Law.
In weighing the public policy considerations against the parties’ arbitration agreement, the court must examine the very purpose of an HP proceeding. In 1974, the New York State Legislature created a special part within the Civil Court of the City of New York, known as the Housing Part, to hear in a single forum all disputes involving the enforcement of state and local laws for the establishment and maintenance of housing standards. (CCA 110; see also NY City Housing Maintenance Code [Administrative Code of City of NY] § 27- *489 2115 [h], [i]; Parkchester Alliance v Parkchester Apts. Co., 180 Misc 2d 548 [Civ Ct, Bronx County 1999].) Proceedings brought in this forum are referred to as “HP proceedings,” and the laws to be enforced include, but are not limited to, the Multiple Dwelling Law, the Housing Maintenance Code (HMC), the Building Code and the Health Code. Both the Multiple Dwelling Law and the Housing Maintenance Code contain preliminary sections that reveal the intent of the legislatures — that the housing stock of the state’s cities be preserved and all occupants be afforded safe and healthy housing. (Department of Hous. Presero. & Dev. of City of N.Y. v Metropolitan Aoe. Corp., 148 Misc 2d 956 [Civ Ct, Kings County 1990].) And despite the Civil Court’s lack of general equitable jurisdiction, section 110 (a) (4) of the Civil Court Act specifically provides the Housing Part with jurisdiction to issue injunctions and restraining orders for the enforcement of housing standards. Moreover, regardless of the relief originally sought by a party, section 110 (c) provides that “the court may recommend or employ any remedy, program, procedure or sanction authorized by law for the enforcement of housing standards, if it believes they will be more effective to accomplish compliance or to protect and promote the public interest.”
As part of its responsibility in enforcing the Housing Maintenance Code, HPD will investigate complaints made by tenants and issue violations accordingly. For example, as lead-based paint poses a serious health problem to adults and children, HPD may issue a violation for same based upon an inspection or a statutory presumption, which the owner must correct within 21 days. (Housing Maintenance Code § 27-2056.) Pursuant to section 27-2115 (i) of the Housing Maintenance Code,
“[i]n the event an owner fails to correct a violation . . . any tenant or group of tenants who requested that [a] violation be issued may apply individually or jointly, to the housing part for an order directing the owner and [HPD] to appear before the court ... If the court finds that the violation has not been corrected, . . . then it shall direct the owner to correct the violation and shall assess [penalties].” (Emphasis added.)
Regardless of whether the petitioner in an HP proceeding is a tenant or HPD, at the conclusion of the trial, if the petitioner prevails the court will issue an order to correct. The few defenses to an order to correct include lack of standing or jurisdic *490 tion, completed repairs, conditions are not code violations, notice of violation is facially insufficient, respondent is no longer the owner and economic infeasibility. (Department of Hous. Preserv. & Dev. of City of N.Y. v 163 Ocean Tenants Corp., NYLJ, June 7, 2000, at 28, col 5 [App Term, 2d Dept]; Bernard v Scharf, 246 AD2d 171 [1st Dept 1998], revd 93 NY2d 842 [1999]; Eyedent v Vickers Mgt., 150 AD2d 202 [1st Dept 1989].) It is not a defense to an order to correct that the tenant refused access to repair the violation (Aguilar v Elk Dr., 117 Misc 2d 154 [Civ Ct, Queens County 1982]), that the violation was caused by natural disaster or third parties beyond a respondent’s control, or that the building has few remaining tenants. (Department of Hous. Preserv. & Dev. of City of N.Y. v Metropolitan Ave. Corp., 148 Misc 2d 956 [Civ Ct, Kings County 1990].) Given HPD’s responsibility in enforcing the HMC, in those instances in which a tenant commences an HP proceeding against the owner, HPD is named as a corespondent, and any civil penalties awarded by the court are payable to HPD. (Shapiro v Townan Realty Co., 162 Misc 2d 630 [Civ Ct, NY County 1994]; Amsterdam v Goldstick, 136 Misc 2d 831 [Civ Ct, NY County 1987].) Of course, being a party to the proceeding, any attempt by an owner to challenge an HPD violation will be opposed by HPD. Besides assisting HPD in the enforcement of the HMC, a tenant who commences an HP proceeding and restores same for civil penalties is also asserting a monetary claim for the benefit of HPD. Given the aforementioned, it is clear that HPD is a necessary party that will play an integral role in the instant HP proceeding. HPD is not, however, a party to the arbitration agreement and vigorously opposes the owner’s attempt to compel arbitration.
In establishing the HP part, and the pervasiveness of the regulatory scheme associated with same, the Legislature made clear their intent to protect and preserve existing housing, regardless of whether the proceeding is commenced by HPD or a tenant, and regardless of whether the apartment or building is vacant or occupied. (Department of Hous. Preserv. & Dev. of City of N.Y. v Metropolitan Ave. Corp., 148 Misc 2d 956 [Civ Ct, Kings County 1990]; Finkelstein and Ferrara, Landlord and Tenant Practice in New York § 16:225 [West’s NY Prac Series, vol G, 2004]; see also Matter of Goldmar Hotel Corp., 283 App Div 935, supra.) The Legislature set specific time frames for the completion of repairs, specific penalties if repairs are not made, and gave the court broad powers to obtain compliance and *491 protect and promote the public interest. This responsibility cannot be placed in the hands of an arbitrator who only has a duty to the contracting parties, is not bound by any principles of substantive law, and has no authority to compel HPD into arbitration. Based on the aforementioned, the court finds that enforcement of the arbitration agreement as it pertains to HP proceedings is void against public policy, and the owner’s motion seeking same is denied.[2]

. The tenant’s opposition was incorporated into a cross motion dated December 28, 2005; however, the affirmative relief sought in said cross motion was settled by the parties.

. Given the public policy violation, the court does not address the tenant’s other arguments in opposition to the motion.